# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

JOHN LANE-EL, et al.,                           )
                                                )
                        Plaintiffs,             )
            vs.                                 )          1:06-cv-0251-LJM-JMS
                                                )
INDIANA DEPARTMENT OF CORRECTION,               )
 et al.,                                        )
                                                )
                        Defendants.             )


## Entry Discussing Motion for Summary Judgment

As used in this Entry, "Lane-El" refers to plaintiff John Lane-El, "Amos-El" refers to plaintiff Albert Amos-El, and "Lawrence-El" refers to plaintiff David Lawrence-El, "MSTA" refers to the Moorish Science Temple of America, "Pendleton" refers to the Pendleton Correctional Facility, "DOC" refers to the Indiana Department of Correction, "Superintendent Knight" refers to Pendleton Superintendent Stanley Knight, "Commissioner" or "Commissioner Donahue" refers to DOC Commissioner David Donahue, "Finnan" refers to former Pendleton Assistant Superintendent, and "Venable" refers to James Venable, Contractual Chaplain at Pendleton.

For the reasons explained in this Entry, the defendants' motion for summary judgment must be **granted.**

## I. Background

The plaintiffs allege that their federally secured rights and their rights under the Indiana Constitution have been violated at Pendleton. They seek damages and injunctive relief. The defendants seek resolution of these claims through the entry of summary judgment.

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of **FED.R.CIV.P.** 56(e) (quoted in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" In a motion for summary judgment, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003)(citations omitted). "Rather, '[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.'" *Id.* (quoting *Waldridge*

*v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994)). If a reasonable jury could return a verdict in favor of the non-movant, summary judgment should not be granted. *Id.* (citation omitted).

A court will grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003) (quoting **FED.R.CIV.P.** 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The court must "construe all facts in a light most favorable to . . . the party opposing summary judgment, and . . . draw all reasonable inferences in his favor." *McGreal v. Ostrov,* 368 F.3d 657, 672 (7th Cir. 2004) (citation omitted). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook,* 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997)). However, the non-moving party bears the burden of coming forward with specific facts from the record which show a genuine issue of material fact. *Morfin v. City of E. Chi.,* 349 F.3d 989, 997 (7th Cir. 2003) (citation omitted). "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. County of Cook,* 709 F.3d 1122, 1126 (7th Cir. 1983).

## II. Discussion

### A. Findings of Fact

On the basis of the pleadings and the expanded record, the following facts are undisputed for purposes of the motion for summary judgment. These facts are limited as they do not include statements not in compliance with Local Rule 56.1(b). *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003)("[A] party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission and deeming the opposing party's proposed findings of fact admitted and then determining whether those facts entitle the moving party to judgment as a matter of law.") (citing cases).

Finnan was an Assistant Superintendent at Pendleton from January 1, 2004, to January 29, 2006. During the summer of 2005, Finnan spoke with Pendleton inmates, who informed him that first, some inmates involved with the MSTA were charging other inmates money to have their names placed on the count letter to attend MSTA services and meetings and second, inmates were required to send money outside of Pendleton to one or more people designated by the individuals running the scheme. The information indicated that some inmates were using the MSTA program for their own financial benefit at the expense of others. The information suggested that inmates who could not pay the demanded amount were excluded from participation in MSTA services. The inmates who conveyed this information were in a position of knowledge and they corroborated each other. According to Finnan, these inmates appeared to be honest and sincere as they discussed the issues with him. Lane-El, however, was not among any inmates who misbehaved in this manner and is not aware of other MSTA members who did.

An inmate exercises control over another inmate when he charges that offender a fee to participate in an activity. Such an exercise of control jeopardizes the safety and security of the dominated offenders and, through actions demanded of them, the safety and security of the facility and the staff. Furthermore, if one religious group is permitted to exercise control in this manner, similar behavior is encouraged by other groups.

Finnan thought it was important to suspend the MSTA program until the completion of an investigation, in order to eliminate any wrongdoing and to avoid encouraging other groups or inmates to emulate it. Accordingly, Finnan suspended the MSTA religious activities in August 2005 and requested that the Pendleton internal affairs investigator investigate the allegations. The decision was based upon the safety and security of Pendleton and of the MSTA program and other religious programs and was not related to MSTA's teachings. This decision was Finnan's and it was made upon the authority delegated to him by Superintendent Knight. Venable had no responsibility for the decision to suspend the MSTA meetings and had no authority to override or alter Finnan's decision.

At the time of the suspension of the MSTA meetings, numerous other, unrelated matters arose that competed for the attention of the PCF investigation staff, and the investigators did not report back to Finnan regarding the allegations involving the MSTA. During late 2005, Finnan was informed through the DOC central office staff that there had been internal problems with the MSTA organization itself. Specifically, Finnan was told that the MSTA had changed and that there was a question as to whether the MSTA continued to support and endorse S.A. Tinnin-Bey, the non-inmate representative who had been the volunteer leader of MSTA followers at Pendleton and other facilities. This information suggested a lack of non-inmate leadership to oversee the operation of the MSTA program at the prison, and made it even more critical to block any activity at Pendleton that compromised the integrity of Pendleton's MSTA program.

After a few months had passed without the issuance of an investigation report, Finnan decided that the importance of permitting the MSTA membership to resume services outweighed the danger posed by the possibility that inmates would resume demanding payment from other offenders. Consequently, Finnan directed that the MSTA be permitted to resume services and meetings. The MSTA resumed services and meetings at Pendleton in late January 2006. Finnan left Pendleton at the end of January 2006 to become superintendent of Wabash Valley Correctional Facility and since that time he has had no further responsibility at Pendleton.

The most concise statement of the plaintiffs' claims is set forth in their report filed on November 15, 2006 (dkt 19):

This is an action brought by the plaintiffs against the defendants for defendants for various violations of their rights to practice their religion under the Free Exercise Clause of the First Amendment to the United States Constitution, Article 1 § 3 and Article 1 § 4 of the Indiana Constitution; The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Privileges and Immunities Clause of the Indiana Constitution, Article 1 § 23.

3

The plaintiffs are not currently confined at Pendleton, rendering their claims for injunctive relief moot. *See Lehn v. Holmes,* 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief . . . become[s] moot."); *Higgason v. Farley,* 83 F.3d 862, 871 (7th Cir. 1996) (same).

### B. Conclusions of Law

*Federal Claims.* The plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983. The court has subject matter jurisdiction over the claim pursuant to 28 U.S.C. §§ 1331 and 1343(3).

A cause of action is provided by 42 U.S.C. § 1983 against "every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."   "Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rightsw elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994); *see Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005) ("[C]onstitutional claims must be addressed under the most applicable provision.").

The plaintiffs' federal claims are premised on the religious freedom guarantee of the First Amendment to the United States Constitution ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .") and the guarantee of Equal Protection of the Fourteenth Amendment ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Inmates retain First Amendment rights that are consistent with incarceration, and prison restrictions limiting or interfering with those rights must reasonably relate to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89 (1987); *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999). In order to sufficiently plead a claim for a violation of the equal protection component of the Fourteenth Amendment under § 1983, plaintiffs must allege that they received different treatment from other similarly situated individuals or groups. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432 (1985).

Several general principles guide the court's consideration of the freedom of religion claims presented.

- Lawful "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (*citing Price v. Johnston,* 334 U.S. 266, 285 (1948)).

- Nonetheless, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979).

- Prison officials are given deference in establishing regulations and in

determining appropriate restrictions, and a court will not second-guess regulations or practices that serve legitimate penological interests. *Turner,* 482 U.S. at 89.

• The Supreme Court has delineated four factors for determining whether a specific regulation or practice serves a legitimate penological interest. *Turner,* 482 U.S. at 89-90. The primary factor is whether a valid, rational connection exists between the restriction and a legitimate interest. *Id.* A restriction on speech that fails to meet this connection fails under *Turner. See Shaw v. Murphy,* 532 U.S. 223, 229-30 (2001). The other factors relevant in determining a restriction's reasonableness include whether the inmate has alternative means of exercising the right; the impact accommodation of the asserted right would have on guards, other inmates, and prison resources; and the absence of a reasonable alternative to the regulation or practice. *Turner,* 482 U.S. at 90.

• In determining whether a prison regulation is "'reasonably related to legitimate penological interests,'" a prisoner "must overcome the presumption that the prison officials acted within their 'broad discretion.'" *Shaw v. Murphy,* 532 U.S. 223 (2001). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003).

• In determining whether a prison regulation is "'reasonably related to legitimate penological interests,'" a prisoner "must overcome the presumption that the prison officials acted within their 'broad discretion.'" *Shaw v. Murphy,* 532 U.S. 223 (2001). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003).

In connection with the Equal Protection claim in particular, "[t]he purpose . . . of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352 (1918). To establish a *prima facie* case under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he: "(1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent." *McPhaul v. Board of Commr's of Madison County,* 226 F.3d 558, 564 (7th Cir. 2000), *cert. denied,* 532 U.S. 921 (2001). With regard to the fifth element, a plaintiff must show that the defendant "acted with a nefarious discriminatory purpose, and discriminated against him based on his membership in a definable class." *Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir. 1996) (internal citations omitted). "A showing that the defendants were negligent will not suffice." *Id.* at 454. The plaintiff "must show that the defendants acted either intentionally or with deliberate indifference."

[T]he Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir. 1982) (citations and internal quotations omitted).

The court's conclusions relative to the plaintiffs' federal claims are the following:

● Commissioner Donahue and Superintendent Knight are not alleged to have personally caused or participated in any of the wrongful actions alleged in the complaint and cannot be held liable based on the doctrine of *respondeat superior. Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (citing *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994), *cert. denied,*513 U.S. 1128 (1995)). Defendant Venable had no responsibility to take the action complained of in the complaint, and no authority to override the decision made by another administrator. These defendants are therefore not liable for any such wrongful actions.

● The Indiana Department of Correction ("DOC") is not a person subject to suit under 42 U.S.C. § 1983, *Billman v. Department of Corrections,* 56 F.3d 785, 788 (7th Cir. 1995), and cannot be sued in federal court because of Indiana's Eleventh Amendment immunity. *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003).

● The decision of Former Assistant Superintendent Finnan to suspend services and programs of the Moorish Science Temple of America ("MSTA") at Pendleton from early August 2005 through mid-January 2006 is at the heart of this case. Finnan's decision was based on information Finnan had received that there was corruption and abuse in the operation of the MSTA at Pendleton, such that some inmates were having money extorted from them in order to participate in MSTA services, and on the need to investigate and respond to such information. This decision was not based on or related in any way to the teachings of the MSTA. The plaintiffs suggest that there was an improper purpose motivating this decision, but they offer only speculation to support that view, and this does not create a genuine question of fact preventing the entry of summary judgment. "Memorializing mere speculation in the form of an affidavit does not convert the speculation into competent evidence," *Gonzalez v. Litscher,* 230 F.Supp.2d 950, 962 (W.D.Wis. 2002), for "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). After a few months passed without the issuance of an investigation report, however, Assistant Superintendent Finnan

decided that, with the passage of time, the importance of permitting the membership of the MSTA to resume services had become greater than the danger posed by the possibility that inmates would resume demanding payment from other offenders. For this reason, Finnan directed that the MSTA be permitted to resume services and meetings. This occurred in mid-January 2006. Inmates retain First Amendment rights that are consistent with incarceration, and prison restrictions limiting or interfering with those rights must reasonably relate to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89 (1987); *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999). The circumstances confronted by Assistant Superintendent Finnan at Pendleton during the Summer of 2005 and his response to those circumstances were fully in accord with the dictates of *Turner,* and the plaintiffs have not shown otherwise. In determining whether a prison regulation is "'reasonably related to legitimate penological interests,'" a prisoner "must overcome the presumption that the prison officials acted within their 'broad discretion.'" *Shaw v. Murphy,* 532 U.S. 223 (2001). As noted above, "[t]he burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003). The plaintiffs have not disproved the validity of Assistant Superintendent Finnan's motives or the historical accuracy of the circumstances supporting those motives. The plaintiffs have knowledge of their own non-involvement in any extortion scheme and can also attest to their lack of knowledge of such a scheme, but their doing so does not establish either that such a scheme did not exist or that Assistant Superintendent Finnan did not reasonably believe it to exist or to respond to the information that he had received. The plaintiffs do not attempt, moreover, to demonstrate that Assistant Superintendent Finnan's response to the information he received was unreasonable under *Turner.*

● The plaintiffs have failed to present a genuine question of fact suggesting that they, as members of the MSTA, were treated differently from members of other religious faiths, or that Assistant Superintendent Finnan acted with discriminatory intent. On the contrary, on this latter point the evidentiary record shows that the MSTA was treated based on factors related to the safety and security of the prison, as would be other groups. This negates the existence of discriminatory intent and is thus fatal to the claim that there was a violation of the Equal Protection Clause of the Fourteenth Amendment.

Claims such as those presented in this case must be considered in light of the special environment of a prison, where administrators "must be accorded wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Pardo v. Hosier*, 946 F.2d 1278, 1280-81 (7th Cir. 1991) (internal quotations omitted). The plaintiffs have not shown any constitutional infringement of their First Amendment right to religious freedom or their Fourteenth Amendment right to equal protection based on the suspension of MSTA services from August 5, 2005, through January 16, 2006.

*State Claims.* The foregoing resolves the plaintiffs' federal claims in the case. This court's jurisdiction over their pendent claims under Indiana law is conferred by 28 U.S.C. § 1367(a). When a district court dismisses the claims over which it had original jurisdiction, it has discretion either to retain jurisdiction over the supplemental claims or to dismiss

them. 28 U.S.C. § 1367(c)(3); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 717 (7th Cir.), *cert. denied,* 119 S. Ct. 167 (1998).

"[W]hen deciding to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). This is an appropriate case in which to retain and exercise jurisdiction over the pendent claims under Indiana state law. *Miller Aviation v. Milwaukee County Bd. of Supervisors,* 273 F.3d 722, 731 (7th Cir. 2001) ("[W]hen the district court, in deciding a federal claim, decides an issue dispositive of a pendant claim there is no use leaving the latter to the state court.") (quotation omitted).

In *Cantrell v. Morris*, 849 N.E. 2d 488 (Ind. 2006), the Indiana Supreme Court held that the Indiana Constitution does not create a private right of action for damages when an existing tort law amply protects the right guaranteed by the Indiana Constitution. 849 N.E. 2d 488 (Ind. 2006). "Under traditional tort doctrine a violation of a statutory or constitutional obligation may give rise to a civil damage claim." *Id.* at 497. In other words, although an implied tort or a damage remedy arising under the Indiana Constitution has not been recognized, "a constitutional provision can supply the duty required for a conventional tort claim." *Id.* at 498, 500. In Indiana, common law tort claims are limited by the Indiana Tort Claims Act ("ITCA"). "If state tort law is generally available even if restricted by the ITCA, it is unnecessary to find a state constitutional tort." *Id.* at 506; *quoted in Kucenko v. Marion County Sheriff*, 2007 WL 1650939, *6 (S.D.Ind. 2007).

The provisions of the Indiana Constitution invoked by the plaintiffs guarantee religious freedom. The plaintiffs have not argued that they lack a state tort remedy for the actions which are alleged in their complaint. Even if they did, no claim under these provisions could survive the factual record which has defeated the corresponding portions of the federal constitution.

## III. Conclusion

"Federal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)). Although convicted prisoners do not forfeit all constitutional protections, we must balance those protections against the fact that lawful incarceration necessarily requires the limitation of many rights and privileges and against the legitimate penological objectives of the prison. The plaintiffs have not identified a genuine issue of material fact as to their claims in this case, and the defendants are entitled to judgment as a matter of law. Their motion for summary judgment is **granted.**

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: 02/20/2008

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana